IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10-CR-43 |
| | ) | |
| DARIUS LEE ANDERSON, | ) | (PHILLIPS/SHIRLEY) |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate. This case came before the Court on February 14, 2011, for an

evidentiary hearing on the Defendant's Motion to Suppress Evidence [Doc. 33], filed on January 18,

2011, and referred [Doc. 34] to the undersigned on the following day. Assistant United States

Attorney Kelly A. Norris appeared on behalf of the Government. Attorney Wayne R. Stambaugh

represented the Defendant, who was also present. The parties presented testimony and argument on

the pending motion. Due to the length and complexity of the testimony, the Court requested a

transcript of the hearing from the court reporter, which it received on February 28, 2011. The Court

took the motion, the parties' filings, and the evidence under advisement on the following day. As

revealed by the inordinate length of this Report and Recommendation, this case involves a number

of complicated and complex factual and legal issues relating to the Fourth Amendment questions

raised by the parties. A number of these issues were neither fully developed at the suppression

hearing nor examined in detail in the parties' filings. Accordingly, a thorough review and analysis

1

of these issues has required more time than is typically contemplated for the resolution of pretrial motions. See 18 U.S.C. § 3161(h)(1)(H) (excluding a thirty-day-period during which the Court has taken a matter under advisement) & -(7)(B)(ii) (providing that the complexity of legal and factual matters may make it unreasonable for the parties to proceed to trial within the time limits established by the Speedy Trial Act).

## I. POSITIONS OF THE PARTIES

The Defendant stands charged [Doc. 1] with the robbery of Rocky Top Market on March 14, 2010 (Count 1); the robbery of the Hampton Inn on March 15, 2010 (Count 3), and two counts of brandishing a firearm during the commission of each of these offenses (Counts 2 and 4). The Defendant asks the Court to suppress the evidence seized from 108 Houston Avenue, Oak Ridge, Tennessee, on March 15 and March 17, 2010. He argues that the warrantless search of this residence on March 15 violated his rights under the Fourth Amendment because the officers did not have the voluntary consent of the homeowner. He contends that the later search of the residence on March 17, pursuant to a search warrant is also unconstitutional because the probable cause for the search is based upon information improperly gained[1] in the March 15 search. He asserts that once the information from the March 15 search is stricken from the search warrant affidavit, the affidavit lacks probable cause to support a search of the residence on March 17, 2010.

The Government responds [Doc. 35] that the homeowner Vernestine Anderson, the Defendant's grandmother, provided knowing and voluntary consent to search her home on March

_____

[1]Although the Defendant characterizes this information as "false statements" in his brief [Doc. 33], the Court infers that he actually means information gained in the initial, unconstitutional search.

2

15, 2010. The Government also argues the search warrant was properly issued based on probable cause, even if the information from the March 15 search was excised. Thus, it maintains that both the March 15 and March 17 searches were proper. Alternatively, the Government further contends that evidence seized from the residence on March 15 would have been inevitably discovered in a search pursuant to a search warrant for the same residence on March 17, 2010. Finally, the Government argues that even if a Fourth Amendment violation exists in this case, exclusion of the evidence is not the proper remedy.

## II. SUMMARY OF THE TESTIMONY

The Government presented the testimony of four law enforcement officers from the Oak Ridge Police Department (ORPD): Officer Dustin Henderson, Officer Brad Jenkins, Officer Jeremy Huddleston, and Detective Jock Coleman.

Officer Dustin Henderson testified that he was on patrol at 4:50 a.m., on March 15, 2010, when he received a radio dispatch reporting a robbery at the Hampton Inn. Officer Henderson went directly to the Hampton Inn and spoke with the clerk who had been robbed. The clerk described the robber as a slim-built black male in a white, mid-1980's four-door Oldsmobile. Officer Henderson reviewed the video from the Hampton Inn's security camera with the clerk. The videotape[2] showed the robber enter the Hampton Inn, ask about renting a room, leave, then enter a

---

[2]The video footage of the events of the early morning of March 15, 2010, was not shown to the Court, because apparently it no longer exists. Officer Henderson testified that there was nothing wrong with the tape when he viewed it on March 15, 2010. Detective Coleman testified that the quality of the video was "not real good at all" when he viewed it at the police station on March 15, 2010, although he also stated that he could see individuals on it and that he could tell that the customer who entered shortly before the robbery and the robber appeared to be the same person. [Tr. at 111] Detective Coleman testified that the videotape from the Hampton Inn was

3

second time, and commit the robbery.

Officer Henderson left the Hampton Inn and began searching for a car meeting the clerk's description in the Scarborough community behind the Hampton Inn. He believed the vehicle had not left the city because he had driven to the Hampton Inn from the north and another officer had reported to the Hampton Inn from the south, but neither of them had passed a white Oldsmobile. Officer Henderson called several Anderson County deputies, and Deputy Robert Carroll advised that he had seen Darius Anderson (the Defendant) driving a car matching the clerk's description. Upon learning this information, Officer Henderson drove to the Defendant's grandmother's house at 108 Houston Avenue, which was his last known point of contact for the Defendant. Officer Henderson arrived at 108 Houston at 5:50 a.m. and saw a white, four-door car parked in the driveway. Officers Henderson and Thomas took up tactical positions on either side of 108 Houston, and Officer Thomas felt the hood of the white car, which was still warm. The officers proceeded to watch the house, called a third officer to watch the back of the house, and called their supervisor to report what was happening.

Around 7:40 a.m., Officer Henderson saw the Defendant come out of the front door of 108 Houston and walk toward the white car. Because they were concerned about the location of the weapon used in the robbery, Officers Henderson and Thomas approached the Defendant with their guns drawn, identified themselves, and told the Defendant to keep his hands in view. Officer

---

almost totally degraded at present, due to being watched repeatedly and the fact that the Hampton Inn had been recording on this same security tape for fifteen years. Detective Coleman agreed that the videotape had deteriorated while in the custody of the ORPD. He said that he copied the videotape onto CD's in order to preserve it, and that he believed that those copies were "clear and working." [Tr. at 116] He later testified that he assumed that the CD's were clear and working when he put them in the evidence room, along with the videotape, but that he did not actually look at the copies.

4

Henderson stated that the Defendant was slow to respond to his commands. Officer Thomas removed a young woman from the area, and Officer Henderson handcuffed the Defendant and placed him in the back of a patrol car. Shortly thereafter, Vernestine Anderson, whom Officer Henderson believed to be the owner of the house, came to the front door and stood in the doorway. Officer Henderson and Lieutenant Jenkins went onto the porch and spoke with her to explain what was happening.

Officer Henderson testified that Ms. Anderson's demeanor was abrupt and confused. The officers told Ms. Anderson about the robbery at the Hampton Inn and that they were looking for an AK-47 assault rifle used in the robbery. While they were talking with Ms. Anderson on the porch, Officer Jeremy Huddleston came up to Lieutenant Jenkins. At this point, Ms. Anderson's demeanor changed, becoming very cordial and polite, and she spoke to Officer Huddleston. From their conversation, Officer Henderson inferred that Ms. Anderson had dealt with Officer Huddleston in the past. Ms. Anderson invited Officer Huddleston to come inside, and Officer Henderson left the porch and went to the driveway to process the scene. Officer Henderson testified that it was unusual for an officer to go into a private home alone because of the safety issues presented by that situation. Lieutenant Jenkins remained on the porch to be close to Officer Huddleston.

On cross-examination, Officer Henderson testified that between 5:50 a.m. and 7:40 a.m., he remained in a "tactical location" east of 108 Houston, where he could see the front door. Officer Henderson's plan was to watch the house until his supervisor arrived and told him what to do next. By the time the Defendant came out of the house at 7:40 a.m., there were four officers present. Officers Henderson and Thomas and Lieutenant Jenkins were in front of the house, and Officer Gallops was in a police car on Tuskeegee Drive behind the house. When the Defendant

5

came out of the house, Officer Henderson took him into custody. Officer Huddleston was not there at that time. Once the Defendant was in custody, Officer Henderson's next objective was to secure the house to preserve any evidence of the robbery located inside, by not permitting anyone to enter or leave until a supervisor arrived and decided to what to do next. Officer Henderson acknowledged that ultimately, the officers wanted to search the residence for the weapon used in the robbery. He said that he could not see the firearm in the white car, just looking from the outside, which led him to believe that the firearm was inside the house.

Officer Henderson stated that he approached Ms. Anderson to advise her of what was happening. He said that Lieutenant Jenkins spoke with Ms. Anderson about searching her home for the rifle. Ms. Anderson was abrupt with them, but then Officer Huddleston came onto the porch and she spoke with him. Ms. Anderson invited Officer Huddleston to come inside. A short time later, he received a telephone call from Officer Huddleston asking for a description of the clothing that the robber wore. Officer Henderson testified that he told Officer Huddleston that the robber wore a blue hoodie, square diamond earrings, and a red lanyard and had a phone and an AK-47. Later that morning, when Officer Henderson returned to the police station, he played the security videotape of the Hampton Inn robbery for Detective Jock Coleman.

Lieutenant Brad Jenkins testified that he came on duty at 6:50 a.m., on March 15, 2010, and received a telephone call from Officer Henderson, who stated that he and two other officers were surveilling 108 Houston Avenue, which they believed contained the suspected perpetrator of the Hampton Inn robbery. Lieutenant Jenkins arrived at 108 Houston around 7:20 a.m. The officers told him that they believed the white four-door sedan parked in the driveway was the vehicle used in the Hampton Inn robbery at around 5:00 a.m. The officers watched the house,

hoping that the Defendant would come out. A short time after Lieutenant Jenkins arrived at 108 Houston, a woman walked from the street onto the driveway toward the white car, and the Defendant came out of the house and walked toward the car and the woman. Lieutenant Jenkins said that the officers called out to the Defendant and asked him to come to them. The Defendant approached the officers, and Officer Thomas asked the woman to step out of the way. The officers took the Defendant toward the street and into custody.

Lieutenant Jenkins stated that a few minutes after they took the Defendant into custody, Vernestine Anderson came to the front door of her home. Lieutenant Jenkins and Officer Henderson went onto the porch to speak with her to ask if they could enter the home to look for the firearm from the robbery. He said that Ms. Anderson was hesitant to allow the officers inside. A couple of minutes later, Officer Huddleston approached Lieutenant Jenkins on the porch to ask him about another case. Lieutenant Jenkins said that Ms. Anderson's demeanor changed when she saw Officer Huddleston. Ms. Anderson seemed to be familiar with Officer Huddleston, was friendly toward him, and invited him to come inside the house. Officer Huddleston entered the home without a backup officer. Despite his concern that an accomplice in the robbery, such as the driver of the white car, was inside, Lieutenant Jenkins permitted Officer Huddleston to enter without another officer. Lieutenant Jenkins remained on the porch so that he could hear if Officer Huddleston called for help. Although he could not hear what Officer Huddleston and Ms. Anderson were saying, Lieutenant Jenkins said the tone of their conversation was calm. Lieutenant Jenkins said that if Ms. Anderson had given "blanket consent" for officers to enter and search her home, more than two officers would have carried out the search in order to save time. He said that he never entered Ms. Andersons's home because she did not want him to do so.

On cross-examination, Lieutenant Jenkins testified that he was at 108 Houston Avenue for about twenty minutes before the Defendant was arrested. Lieutenant Jenkins said that during that time, the officers waited, hoping that the Defendant would come outside so that they could take him into custody. After the Defendant's arrest, the officers did not attempt to get a search warrant for the house but, instead, asked the resident if they could search. When Ms. Anderson denied consent, the officers backed away, except for Officer Huddleston, who was invited inside. Lieutenant Jenkins did not recall Officer Huddleston leaving and then reentering the house that morning. Lieutenant Jenkins testified that he does not carry consent forms with him in his patrol car.

On redirect examination, Lieutenant Jenkins stated that neither he nor, as far as he knew, anyone from the ORPD directed Officer Huddleston to approach Ms. Anderson's porch on that morning. He said that he was not aware that Officer Huddleston had any kind of rapport with Ms. Anderson.

Officer Jeremy Huddleston testified that he has been a patrol officer with the ORPD for just over three years. At the ORPD roll call briefing on the morning of March 15, 2010, Officer Huddleston learned that an armed robbery had occurred at the Hampton Inn and that officers had located the suspected getaway vehicle, a white four-door Oldsmobile Cutlass, at 108 Houston Avenue. Officer Huddleston was dispatched to 108 Houston Avenue, after the officers at that location made contact with the Defendant. When he arrived at the scene, he saw the white four-door car in the driveway. Eight to ten officers were there, and the Defendant and another person were already detained. Officer Huddleston's job was to remain at the road to secure the area.

Officer Huddleston saw Lieutenant Brad Jenkins and Officer Dustin Henderson standing on the front porch talking with the homeowner, Vernestine Anderson, who was standing

8

in the doorway. Officer Huddleston walked up to Lieutenant Jenkins to ask him a question. When he walked up, Ms. Anderson said, "You guys can't come in, but I will let him in," and pointed to Officer Huddleston. Ms. Anderson stated that she had spoken with Officer Huddleston before and that he had "been good" to her. Officer Huddleston then recalled that in February 2010, the Defendant had been in the Emergency Room at Methodist Medical Center with serious injuries following a car crash and was being belligerent. The hospital staff had asked Officer Huddleston to escort the family members out of the Defendant's room because the family was escalating the Defendant's behavior and preventing the administration of medical care. Officer Huddleston had spoken with the staff and facilitated Ms. Anderson's return to the Defendant's room. He said that Ms. Anderson had thanked him for this at the time.

Officer Huddleston testified that after Ms. Anderson said he could go in to her home, he entered the living room and sat on the couch just inside the front door. Officer Huddleston said that he entered the house alone, which presented some safety concerns, because Ms. Anderson did not want the other officers to come in. He said that he discussed what was happening with her and tried to answer her questions. He told her that the police were looking for a gun, which they believed the Defendant had used to commit a crime, and that the police believed the gun was inside her house. Ms. Anderson told him that the Defendant lived with his mother but had stayed in the guest bedroom the previous night. Officer Huddleston told Ms. Anderson that he wanted to search the guest bedroom for the gun, and she told him that he would have to ask Lee Dixon, whom she referred to as the Defendant's grandfather. Officer Huddleston went outside and told Mr. Dixon that he wanted to search the house, primarily the guest bedroom, for the gun. Mr. Dixon responded that he did not live there and that it was up to Ms. Anderson. Officer Huddleston reentered the home and told Ms.

Anderson what Mr. Dixon had said. Officer Huddleston testified that Ms. Anderson "then gave [him] consent." Officer Huddleston believed that Ms. Anderson understood to what she was consenting. He said he did not have her sign a consent form, because he did not have one. Mr. Dixon was allowed to come inside at this time.

Officer Huddleston stated that after receiving consent, he asked if Officer Steakley could come inside and help him search, explaining that Officer Steakley was trustworthy and that it would make the search go much quicker. Officer Huddleston testified that Ms. Anderson agreed that Officer Steakley could enter. Officer Huddleston and Officer Steakley then searched the guest quarters. He testified that if this had been a typical "blanket consent" situation, he would not have been leading the search and some four to six officers would have searched the home. Mr. Dixon, whom Officer Huddleston described as calm, remained in the guest quarters with the officers during the search.

Officer Huddleston said that the guest bedroom was pink, had a feminine decor, and had a purse hanging from the closet door. He said that Ms. Anderson had referred to this room and the adjoining bathroom as the guest quarters and that Mr. Dixon said that the Defendant did not live there but spent the night in the guest quarters. In the guest bedroom, the officers found a dark hooded jacket. They also found a red shoe string or lanyard with a key and a red cellular telephone on the night stand. The officers found a pair of large diamond-like earrings on a glass table in the bathroom of the guest quarters. Officer Huddleston testified that Officer Henderson told him that the robber had a red cellular telephone, a red lanyard, and diamond earrings. The officers also found an AK-47 rifle in the recessed portion of the guestroom headboard. Officer Huddleston left the residence and returned with a camera to photograph the rifle in its original position.

10

Officer Huddleston testified that he told Ms. Anderson that they had found a rifle in the bedroom and that she said she did not know it was there. Officer Huddleston characterized Ms. Anderson as being calm during her initial conversation with him and during the search, although upset whenever she discussed her concerns about the Defendant. Officer Huddleston said that Ms. Anderson seemed very upset upon learning about the gun. Officer Huddleston stated that at no point during the search did Ms. Anderson ask the officers to leave or express confusion as to why they were searching. To Officer Huddleston's knowledge, Ms. Anderson never filed a complaint regarding the search of her home on March 15, 2010.

On cross-examination, Officer Huddleston testified that during roll call on March 15, 2010, he received a brief physical description of the person who robbed the Hampton Inn and his clothing. Officer Huddleston was dispatched to 108 Houston Avenue on March 15, 2010, for safety reasons. He arrived at 108 Houston at 7:45 or 7:50 a.m. Although the Defendant had already been detained at the time Officer Huddleston arrived, the AK-47 had not been located. He stated that approximately twenty to thirty minutes passed between his arrival at 108 Houston and his reentry of the house after speaking with Lee Dixon. He said that Ms. Anderson gave him permission to reenter. He testified that he asked Ms. Anderson if he could search the guest bedroom and that she showed him the guest bedroom. He said that while searching the guest bedroom for the AK-47, he seized the cellular telephone, the earrings, the keys, and the hoodie because they were in plain view. After the search, Officer Huddleston saw the Defendant in a patrol car in front of the house.

Pursuant to questions from the Court and followup questions from the attorneys, Officer Huddleston stated that at roll call at 6:40 a.m., he learned that the robber of the Hampton Inn was wearing large diamond-like stud earrings. While he was inside 108 Houston searching, he

11

called Officer Henderson on his cellular telephone and learned that the robber also wore a lanyard with a key on it around his neck and was talking on a red cellular telephone.

Detective Jock Coleman testified that he investigated the March 15, 2010 robbery of the Hampton Inn. On March 15, 2010, Officer Huddleston told him that Huddleston had gotten consent to search 108 Houston from the owner and had seized an assault rifle, diamond earrings, a red shoestring, and a cellular telephone. Detective Coleman filled out the property report for those items and logged them into the evidence system. Also, on March 15, Detective Coleman interviewed the Defendant at the police station. The Defendant told him that although he was at the Hampton Inn at one point in time, he did not return and rob it. Detective Coleman testified that he obtained a search warrant for 108 Houston and searched the house on March 17, 2010. During this search, the executing officers seized a reversible waist coat with a hood, a blue hooded waist jacket, and two Atlanta Braves baseball caps.

Detective Coleman stated that he prepared the affidavit for the search warrant with information he gained during his investigation. He stated that he included in the affidavit that Officer Huddleston obtained consent to search Ms. Anderson's residence because Officer Huddleston had told him that. He said he had no reason to doubt that Officer Huddleston had obtained consent. He stated that he viewed the video from the Hampton Inn security camera on the morning of March 15, 2010. Detective Coleman testified that on the video, he saw the Defendant enter the Hampton Inn and ask about room rates. Then, he saw that same person reenter the Hampton Inn a few minutes later and rob it. He stated that at the time he initially viewed the video on March 15, 2010, the quality of the video "was not real good at all" but that he could still see individuals on it. He said that currently, the video was almost "totally degraded."

12

On cross-examination, Detective Coleman testified that between March 15 and March 17, 2010, he reviewed the security video from the Hampton Inn three or four times. Although he knew of the Defendant, he had never had any personal dealings with him before March 15, 2010. He stated that he had photographs of the Defendant when he viewed the video on March 15. He stated that the video revealed that the robber entered the Hampton Inn wearing a baseball cap, a hoodie, and a bandana around his mouth and nose. He could not see the robber's face. The robber was pointing the gun at the clerk. The Hampton Inn clerk reported seeing a white car pull in prior to the robbery, when a person entered the hotel. The clerk stated that the same car pulled in a second time, just before the robbery. The clerk said that the robber got into that white vehicle both times. Detective Coleman agreed that the videotape had deteriorated since the time of the robbery. He explained that the videotape had degraded because the Hampton Inn had recorded over that same tape for years. He said that to preserve the video footage, he copied it on to CD's. At the time he made the recordings, the CD's were clear and working.

With regard to the search warrant affidavit, Detective Coleman testified that he did not intend to emphasize the information in paragraph three and that paragraph three was in bold typeface merely because of the form that he used. In response to a question from the Court, Detective Coleman stated that he did not view the CD copies of the security video after he made them.

The Defendant called a single witness Vernestine Anderson, who testified that she has lived at 108 Houston Avenue in Oak Ridge, Tennessee, for thirty-three years. She stated that her grandson Darius Lee Anderson had lived with her there from time to time since he was born. He also stayed with his mother and was in juvenile detention for a time. When he got out of juvenile

13

detention on June 9, 2009, the Defendant lived with Ms. Anderson until his arrest on March 15, 2010.

Ms. Anderson stated that between 7:30 and 7:45 a.m., on March 15, she was in bed, when she heard the Defendant get up and she heard the door when he left the house. She next heard a lot of noise outside. She got up, dressed, and went to her front door. Two policemen approached and identified themselves. Ms. Anderson identified Officer Huddleston, who was seated in the courtroom, as one of the two officers on her porch that day. She said that she knew him from when the Defendant was in the hospital and said that "[h]e was real nice." She asked the officers what was going on. Officer Huddleston told her that the Defendant may have gotten himself into a little trouble, like a robbery. She asked Officer Huddleston to come in because she could not hear him well through the storm door. Officer Huddleston asked if his friend could come in too, and they both entered.

Ms. Anderson said that Officer Huddleston asked if they could search her residence and that she told him "no." At that time, Mr. Dixon came over, and she told the officers to ask Mr. Dixon if they could search. The officers asked Mr. Dixon, who told them that he did not live at the residence. Ms. Anderson said that Mr. Dixon use to live at 108 Houston and that she had directed the officers to ask him because he knew more about the law and things of that nature. Ms. Anderson testified that after asking Mr. Dixon for consent to search, they did not ask her for consent again. Officer Huddleston next asked her where the Defendant's bedroom was located. She told him that the Defendant's bedroom was next to her room but that the Defendant occasionally slept in the guestroom because his furniture was still at his mother's house. At that point, the officers told her to sit down and walked to the guestroom. Ms. Anderson said that she sat in the kitchen, put her head

14

on the table, and cried. She said that she did not say anything to the officers when they began searching, even though she had told them that they could not search, because she was not knowledgeable about the law. She did not look up from the table when the officers came out and said they had found what they were looking for, a gun.

Ms. Anderson testified that she has six or seven overnight guests from out of town, who stay in the guestroom each year. She stated that she receives disability payments, has trouble with mobility, has had a nervous breakdown, and has had surgery on her knee, both shoulders, and her back in 2010. She stated that she did not know a person could file a complaint against the ORPD for their search of her home on March 15. She said that Detective Coleman came to her house with a search warrant on March 17, 2010, and searched it.

On cross-examination, Ms. Anderson stated that the Defendant lived with her after he was born until age seventeen, when he went to live with his mother. That is why the Defendant's furniture was at his mother's house when he came to live with Ms. Anderson after he turned nineteen years old. She agreed that the Defendant stayed with his mother during this time also. She stated that the Defendant came in between 1:30 and 2:00 a.m. on March 15, 2010, and slept at her house. He slept in the guest bedroom because he did not have a bed in his bedroom. She stated that she had authority over the guest bedroom and kept her clothes and jewelry in there.

Ms. Anderson testified that she first met Officer Huddleston at the hospital in February 2010. On March 15, 2010, she invited Officer Huddleston into her home to explain what was going on outside. She said that Mr. Dixon was either already inside the house or was just entering, when she told Officer Huddleston to ask Mr. Dixon and he might let them search because she did not know anything about the law. She and Mr. Dixon use to live together, and Mr. Dixon

had helped raise the Defendant. Mr. Dixon no longer lived at 108 Houston, but she and Mr. Dixon remained close friends. Ms. Anderson agreed that when she told Officer Huddleston to ask Mr. Dixon about whether he could search, she had said that Mr. Dixon could make the decision on whether they could search for her. She agreed that she would have done whatever Mr. Dixon had said. She said she was standing there with the officers and Mr. Dixon when Officer Huddleston asked Mr. Dixon if he could search. Mr. Dixon said that he could not give consent because he did not live at that address anymore. At that point, Officer Huddleston asked where was the Defendant's bedroom, and Ms. Anderson told them that he had one bedroom without any furniture in it behind her room and that the Defendant's other bedroom was across the hall. Mr. Dixon spoke up and said that this second bedroom was the guestroom. The officers headed toward the guestroom and told her to sit down. She did not recall whether Mr. Dixon accompanied the officers to the guestroom.

Ms. Anderson stated that after Mr. Dixon said that he could not give consent, the officers did not ask her for consent again. She did not speak up at that time because she was upset, nervous, and blood was rushing to her head because she had not taken her blood pressure medicine that morning. She said that Officer Huddleston had explained why the police were at her house, stating that they believed the Defendant had committed a robbery at the Hampton Inn, but that he did not tell her that there might be a gun in her house. She stated that she did not own any guns and would have been uncomfortable with an AK-47 in her house. She agreed that she would have wanted someone to remove it. Ms. Anderson acknowledged that she did not ask the officers to leave her house that morning and explained that she was nervous and confused. She said that Officer Huddleston was nice to her that morning and that Officer Steakley did not say anything to her. She stated that she did not want anyone to search her house and that she later learned that it was illegal

16

for anyone to search her house without her consent.

Ms. Anderson testified that visitors from Chicago had stayed at her house about one month before March 15, 2010. She identified her daughter's car parked at her house in Exhibit 2, a photograph.

## III.  FINDINGS OF FACT

Based upon the testimony and exhibits provided at the evidentiary hearing, the Court finds the following facts occurred prior to Ms. Vernestine Anderson opening her door on the morning of March 15, 2010:

At 4:50 a.m. on March 15, 2010, Officer Dustin Henderson was dispatched to the Hampton Inn to investigate an armed robbery. Officer Henderson interviewed the clerk, who was the victim of the robbery. The clerk described the robber as a slim-built black male in a four-door white, mid-1980's Oldsmobile. Officer Henderson reviewed the video from the security camera with the clerk. The video showed an individual enter the Hampton Inn, inquire about room rates, and leave. Shortly thereafter, an individual, who appeared to be the same person who had asked about room rates, entered with a bandana covering his nose and mouth, pointed a rifle at the clerk, and committed the robbery. The clerk reported seeing the same white car pull in before each time the individual entered the hotel.

Taking the videotape from the Hampton Inn, Officer Henderson began searching for the perpetrator in the Scarborough community behind the Hampton Inn. He believed that the robber had not left the city because he had not passed a white car as he drove to the Hampton Inn from the north and another officer had not seen a white car as he drove to the Hampton Inn from the south.

17

Officer Henderson called an Anderson County deputy who advised that he had seen Darius Anderson driving a car that matched the clerk's description. Officer Henderson drove to Darius Anderson's grandmother's house at 108 Houston Avenue, which was his last known point of contact for Darius Anderson. He arrived at 108 Houston at 5:50 a.m. and saw a white, four-door Buick parked in the driveway. His backup officer felt the car's hood and found it to be warm. Officer Henderson and other officers watched the house, waiting for Darius Anderson to come out. Lieutenant Brad Jenkins arrived at 108 Houston at 7:20 a.m. and was briefed on the situation.

At 7:40 a.m., Darius Anderson came out of the front door of 108 Houston and walked toward the white car and a young woman who had approached the car from the street. The officers drew their guns, identified themselves, and ordered Anderson to keep his hands in view and to come toward them. Officer Henderson handcuffed Anderson and placed him in a patrol car. Officer Jeremy Huddleston arrived at 108 Houston around 7:45 a.m. to aid in securing the area.

At this point, the accounts provided by the police and the homeowner diverge. The Court will make additional factual findings regarding the events immediately preceding the search of 108 Houston as a part of its analysis of the issues.

Later on the morning of March 15, 2010, after Officers Huddleston and Steakley had searched the home, Detective Jock Coleman reviewed the video from the Hampton Inn security camera with Officer Henderson. He identified the individual who entered the Hampton Inn to ask about room rates as the Defendant by comparing the video image to photographs of the Defendant. He spoke with Officer Huddleston and created an inventory of the items seized from 108 Houston, which included an AK-47 rifle, diamond earrings, a red shoe string, and a cellular telephone. Also, that day, Detective Coleman interviewed the Defendant at the police station. The Defendant stated

18

that he had been to the Hampton Inn but denied robbing it. Detective Coleman drafted a search

warrant affidavit based upon the information he had learned in his investigation, including Officer

Huddleston's statement that the homeowner had given him consent to search 108 Houston Avenue

on March 15. Detective Coleman obtained a search warrant for 108 Houston Avenue and executed

it on March 17, 2010. During that search, he seized two hooded jackets and two Atlanta Braves

baseball caps.


## IV.  ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and

seizures. The Defendant calls for the suppression of all evidence obtained from 108 Houston

Avenue because it was seized in violation of the Fourth Amendment. The parties raise the following

issues:  (1) Was the March 15, 2010 warrantless search of the residence based on the valid consent

of the homeowner?, (2) Was the March 17, 2010 search of the residence pursuant to a valid search

warrant? and (3) If a Fourth Amendment violation or violations occurred, is suppression of the

evidence appropriate?  The Court will examine each of these issues in turn.


### A.  Warrantless Search of 108 Houston Avenue on March 15, 2010

"[S]earches conducted outside the judicial process, without prior approval by judge

or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few

specifically established and well-delineated exceptions."  Katz v. U.S., 389 U.S. 347, 357 (1967)

(footnotes omitted).  In order for the March 15, 2010, warrantless search of 108 Houston Avenue to

pass Fourth Amendment muster, it must fall within one of these narrowly drawn exceptions to the

warrant requirement. See id.; Jones v. U.S., 357 U.S. 493, 499 (1958) (observing that "[t]he exceptions to the rule that a search must rest upon a search warrant have been jealously and carefully drawn"). One exception to the warrant requirement is a search pursuant to the voluntary consent of one with authority. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); United States v. Van Shutters, 163 F.3d 331, 335 (6th Cir. 1998) (holding that "[i]t is well-established that a warrantless search by law enforcement officials will be upheld if a detainee has voluntarily consented to the search"). Here, the Government argues that the officers properly searched 108 Houston Avenue pursuant to the voluntary consent of the homeowner Vernestine Anderson. The Defendant contends that (1) Ms. Anderson never consented to the search of her home or, alternatively, (2) any consent that she gave was involuntary.

In determining whether consent was granted in this case, the Court is guided by the following principles:  Consent to search must be "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." United States v. Canipe, 569 F.3d 597, 602 (6th Cir.), cert. denied 130 S. Ct. 655 (2009); United States v. Worley, 193 F.3d 380, 385 (6th Cir. 1999); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990).  Furthermore, consent must be more than mere acquiescence to apparent lawful authority. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968); Worley, 193 F.3d at 386.  The government bears the burden of proving that the consent was voluntary and not "the result of coercion, duress, or submission to a claim of authority" based upon the totality of the circumstances. Id.  The government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. Id. at 385.

*(1) Does the Defendant Have a Privacy Interest in 108 Houston Avenue?*

As an initial matter, the Court must determine whether the Defendant has a recognized privacy interest in 108 Houston Avenue or what is commonly known as "standing" to contest the search. In order to contest whether a search comports with the Fourth Amendment, the defendant must have "a reasonable expectation of privacy" in the location searched. Rakas v. Illinois, 439 U.S. 128, 143 (1978). "It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001). Whether the defendant enjoys a reasonable expectation of privacy does not turn solely upon the defendant's subjective belief but also depends upon (1) the defendant's interest in and control of the place searched, (2) any measures the defendant took to ensure privacy, and (3) whether society recognizes the defendant's expectation as reasonable. United States v. Padin, 787 F.2d 1071, 1075-76 (6th Cir.), cert. denied, 479 U.S. 823 (1986).

In the present case, Vernestine Anderson testified that the Defendant had lived with her from birth to age seventeen, at which time he went to live with his mother. At some point, the Defendant was in juvenile detention and was released on June 9, 2009. Ms. Anderson testified that the Defendant came to live with her after his release but that he also stayed with his mother. Ms. Anderson said that the Defendant's bedroom was unfurnished because his furniture was still at his mother's house, so the Defendant slept either in the guest bedroom or on the couch. Ms. Anderson stated that she had authority over the guest bedroom, that her clothing and jewelry remained in there, and that she had hosted six or seven guests in that room over the last year. She said that the Defendant had slept in the guest bedroom on March 15, 2010. Officer Henderson testified that 108

21

Houston was his last known point of contact for the Defendant, because he had taken a report there some months earlier, when the Defendant was in state custody, regarding the Defendant running away from his grandmother's house. Officer Henderson testified that he did not think that the Defendant lived at 108 Houston Avenue. Photographs of the guest bedroom showed a purse hanging on the closet door and that the room had a feminine decor.

The Court finds that the Defendant was, at least, an overnight guest at 108 Houston Avenue and, at most, a part-time resident. In its response [Doc. 35] to the suppression motion, the Government acknowledges that as an overnight guest, the Defendant has a Fourth Amendment right to privacy in the home. An overnight social guest has a reasonable expectation of privacy in another's home where he or she is staying because people naturally seek a secure and private place to sleep when they are away from their own home. Minnesota v. Carter, 525 U.S. 83, 89 (1998) (citing Minnesota v. Oleson, 495 U.S. 91, 98-99 (1990)). As either an overnight guest or a part-time resident, the Defendant has standing to contest the searches of 108 Houston Avenue.

If the Defendant is a part-time resident of 108 Houston Avenue, the question arises as to whether the officers had to seek his consent to search. Officers may search a residence pursuant to the valid consent of one with common authority over the residence and that consent is valid as to an absent resident. United States v. Matlock, 415 U.S. 164, 170 (1974). On the other hand, if a physically present co-occupant refuses consent to search the residence, the search is invalid as to that occupant even if another co-occupant consents to the entry and search. Georgia v. Randolph, 547 U.S. 103, 106, 120 (2006). In the present case, the Defendant was in police custody in a patrol car at the time that ORPD officers asked for consent to search 108 Houston. In Randolph, the defendant was at the residence at the time the officers sought consent to search and "expressly refuse[d]"

consent. Id. at 106. The Supreme Court acknowledged that it was "drawing a fine line" between Randolph's circumstances and prior case law in which the defendant had been detained nearby, Matlock, 415 U.S. at 166, or was asleep inside the house, Illinois v. Rodriguez, 497 U. S. 177, 180 (1990), at the time the co-occupant consented: "[I]f a potential defendant with self-interest in objecting is in fact at the door and *objects*, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the colloquy, loses out." Randolph, 547 U.S. at 121(emphasis added); see also United States v. Ayoub, 498 F.3d 532, 540-41 (6th Cir. 2007) (approving consent by defendant's sister who had apparent authority over premises, when officers had previously permitted the defendant to leave the residence without requesting consent to search), cert. denied, 129 S. Ct. 37 (2008). When a defendant is "not present and objecting," one with authority over the premises can provide consent to search. Ayoub, 498 F.3d at 541.

The Supreme Court approved what it agreed was a highly formalistic distinction as long as the police had not removed the potential objector to prevent his or her objection. Randolph, 547 U.S. at 121; Ayoub, 498 F.3d at 541 (holding that the police did not remove the defendant from the home to prevent his objection to consent, even if they did not avail themselves of the opportunity to ask for his consent before he left of his own volition). Like in Ayoub, the Court "find[s] it curious that the officers never asked [the Defendant] for consent to search, though they had every opportunity-especially when they [stopped and handcuffed him immediately after] he left the house. Indeed, one might suspect that the officers believed that [the Defendant] would deny consent and they instead went to" the Defendant's grandmother. See id. at 540. Nevertheless, the Defendant neither raised nor argued this position, and the only evidence before the Court reveals that the

23

officers were concerned about officer safety due to their belief that the Defendant might have access

to the assault rifle, which they believed the Defendant had hidden in the house. Accordingly, the

Court finds that even if the Defendant can be considered a part-time resident of 108 Houston

Avenue, the fact that the ORPD did not seek his consent to search does not invalidate the search of

the home, as long as the police received valid consent by one with authority.


*(2) Did Vernestine Anderson Voluntarily Consent to the Search of the Guest Bedroom?*

At the evidentiary hearing, the Government and the Defendant presented divergent

accounts of what occurred after Ms. Anderson opened her front door on the morning of March 15,

2010.

*Government's Version*

According to the Government, Officer Henderson and Lieutenant Jenkins walked up

to the door, told Ms. Anderson about the robbery of the Hampton Inn, and asked to come inside to

look for the AK-47 rifle used in the robbery. Ms. Anderson was abrupt and confused and refused

to allow them to come in. Officer Huddleston came onto the porch to speak with Lieutenant Jenkins.

Ms. Anderson recognized Officer Huddleston from an earlier encounter and her demeanor became

polite and cordial. She invited Officer Huddleston to come inside.

Officer Huddleston entered the living room and sat on the couch. He explained that

the police were looking for a gun, which they believed the Defendant had used to commit a robbery,

and that they believed the gun was inside her house. Ms. Anderson said that the Defendant had slept

in the guest bedroom the previous night, and Officer Huddleston asked to search the guest bedroom

for the gun. Ms. Anderson told him that he would have to ask Mr. Lee Dixon. Officer Huddleston

went outside and asked Mr. Dixon if he could search the guest bedroom for a gun. Mr. Dixon said

that he did not live there and that it was up to Ms. Anderson. Officer Huddleston reentered the house

and told Ms. Anderson what Mr. Dixon had said. Ms. Anderson then "gave [him] consent." Officer

Huddleston asked Ms. Anderson if he could search the guest bedroom and she showed him where

the guest bedroom was. Officer Huddlston requested and Ms. Anderson permitted Officer Steakley

to come inside to help with the search. Officers Huddleston and Steakley were accompanied to the

guest quarters by Mr. Dixon, and they searched the guest bedroom and bathroom. While searching,

Officer Huddleston called Officer Henderson on his cellular telephone to gain clarification on what

the robber wore. Officer Huddleston told Ms. Anderson that they had found a gun. Ms. Anderson

became very upset at this point and said that she did not know it was there.


### Defendant's Account

According to the Defendant, Ms. Anderson opened her front door and was approached

by Officer Huddleston and another officer. She recognized Officer Huddleston from an earlier

encounter when the Defendant was in the hospital, and she thought Officer Huddleston was nice.

She asked the officers what was going on, and Officer Huddleston told her that the Defendant may

have gotten into a little trouble, like a robbery. She invited Officer Huddleston to come inside

because she could not hear him well. Officer Huddleston asked if the other officer with him could

come in also, and both officers entered. Officer Huddleston asked if they could search her home and

she told them "no."

Mr. Dixon came in, and Ms. Anderson told the officers to ask Mr. Dixon whether they

could search because he knew about the law. Ms. Anderson heard Mr. Dixon tell the officers that

he could not give them permission to search because he did not live at that address anymore. Officer Huddleston asked Ms. Anderson where the Defendant's bedroom was located. Ms. Anderson told them that the Defendant's bedroom was beside her room but that he sometimes slept in the guest bedroom. The officers told her to sit down, and they walked to the guestroom and began searching. She sat in the kitchen, placed her head on the table, and cried. She did not look up when Officer Huddleston came out and told her that he had found a gun.

*Analysis*

At first blush, the issue of whether the officers received consent to search 108 Houston Avenue on March 15, 2010, appears to come down to an old-fashioned swearing contest between Officer Huddleston and Ms. Anderson. It appears that "he said" she gave consent, while "she said" she did not. However, after listening to the testimony, the Court was initially left with two impressions. First, both Officer Huddleston and Ms. Anderson seemed to be quite credible with regard to their respective versions of what occurred, although the Court notes that they each had their own biases. Second, Officer Huddleston's inexperience may have caused him to believe that he had consent to search when he actually did not. After a close review of the transcript, the Court finds both of those initial impressions to be correct and to explain the seeming inconsistency in the testimony of these two credible witnesses. The Court finds that after being unable to secure Ms. Anderson's verbal consent to search or Mr. Dixon's "permission" to search, Officer Huddleston asked about the location of the Defendant's bedroom. Officer Huddleston then took Ms. Anderson's response regarding the location of the bedroom as her consent to search. The Court finds this response is not adequate to constitute valid consent to search. For the following reasons, the Court

26

finds the Government did not carry its requisite burden of proving by clear and positive testimony and to a preponderance of the evidence that (1) Ms. Anderson actually gave unequivocal and specific consent and (2) the alleged consent was given freely, voluntarily, and intelligently.

*(i) No proof of unequivocal and specific consent*

First, the proof of Ms. Anderson's agreeing to the search was very limited and marginal rather than clear, positive, or specific and was conclusory rather than factual in nature. Officer Huddleston's only affirmative testimony that Ms. Anderson gave consent was a conclusory statement at the end of a narrative answer to a question about what he told Mr. Dixon:

> A: I pretty much relayed the information to him that I asked Ms. Anderson. I said we wanted to search the house for the gun, primarily the guest quarters. He said, "I don't live there. It's not up to me. It is whatever she wants to do." I go back in and I relay that information to Ms. Anderson. She then gave me consent.
>
> Q: Did she know what she was consenting to?
>
> A: Yes.

[Tr. at 15] On cross-examination, Officer Huddleston merely agreed that Ms. Anderson showed him where the guest bedroom was located, at some point after he asked if he could search:

> Q: . . . . You are saying you asked Vernestine Anderson if you could search the guest bedroom?
>
> A: Yes, sir.
>
> Q: She showed you where that guest bedroom was?
>
> A: Yes.

[Tr. at 47]

Officer Huddleston's statement that Ms. Anderson "gave me consent" is a conclusion

27

rather than a fact. Whether Ms. Anderson's response, i.e., the specific words she used along with her demeanor and the totality of the circumstances, amounts to consent is a question for this Court to decide. A lay witness's testimony adopting a legal conclusion is "both incompetent and unpersuasive" and infringes on the court's role. Canipe, 569 F.3d at 603. At no point did Officer Huddleston testify about the words that Ms. Anderson used, if any, that constituted what he believed to be the alleged consent. The absence of any testimony on the manner in which Ms. Anderson allegedly gave consent is particularly troubling because the issue of consent is the central issue in the case. As such, the Government has failed to prove that the alleged consent was actually given or that it was even oral, much less specific and unequivocal.

Second, the Court finds that the Government provided no proof to corroborate Officer Huddleston's conclusory statement that Ms. Anderson gave him consent. Officer Henderson and Lieutenant Jenkins were there at 108 Houston Avenue, but they did not hear the conversation between Officer Huddleston and Ms. Anderson. Officer Steakley was present inside the house, but from Officer Huddleston's testimony, it seems that he did not come in until after Ms. Anderson gave the alleged consent. Conversely, Ms. Anderson testified that the second officer who searched entered the house at the same time as Officer Huddleston. Either way, the Government did not present the testimony of Officer Steakley[3] so that the Court could ascertain whether he could corroborate Officer Huddleston's belief that he had gained consent.

Likewise, neither party called Mr. Dixon, although he was present at the hearing, and although both Officer Huddleston and Ms. Anderson testified that Mr. Dixon was in the house at the

---

[3]It is the Court's recollection that Officer Steakley was present in the courtroom but was not called as a witness.

point that the officers began searching. Ms. Anderson testified that Mr. Dixon was inside when Officer Huddleston asked him, pursuant to Ms. Anderson's request, if Huddleston could search, and that she overheard his answer. Officer Huddleston testified that he left the house to talk with Mr. Dixon, then told Ms. Anderson what Mr. Dixon had said when he came back inside. The Court notes that Officer Huddleston's and Ms. Anderson's accounts of Mr. Dixon's response to Huddleston's question are virtually identical. Mr. Dixon presumably could have clarified at what point he entered the house that morning and whether he overheard Ms. Anderson's response, if any, to his statement that he could not give consent. Finally, the Court notes the absence of any recording of the conversation or written consent form to corroborate Officer Huddleston's statement that he gained consent.

Third, the alleged consent is inconsistent with Ms. Anderson's repeated refusals to permit a search. The Government's witnesses, Officer Henderson and Lieutenant Jenkins, both testified that Ms. Anderson refused to permit them to come in her house or to consent to a search to locate the assault rifle. Officer Huddleston testified that when he first asked Ms. Anderson if he could search for the weapon, she said "no." Both parties presented testimony that Mr. Dixon denied having the authority to permit a search of 108 Houston and said that permission to search was up to Ms. Anderson. Ms. Anderson testified that she refused the officer's request to search and that she did not want anyone searching her house. The Court finds the fact that Ms. Anderson initially refused to permit the officers to search her home–at least once and, by the Government's account, twice–is unimpeached. Her repeated refusals cause the Court to view Officer Huddleston's conclusory statement that he ultimately gained consent with a jaundiced eye.

In such a case of clear refusal, the officers should have sought a search warrant:

29

When "officers are not responding to an emergency, there must be compelling reasons to justify the absence of a search warrant[.] . . . . Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police." McDonald v. United States, 335 U.S. 451, 454-55 (1948). Moreover, in light of Ms. Anderson's repeated refusals to allow the officers to search, the absence of a written consent form or some other straightforward substantiation of the homeowner's subsequent consent is even more keenly felt. Finally, because the Government must show with clear and positive testimony and by a preponderance of the evidence that Ms. Anderson recanted her earlier refusals and permitted the search, the failure to provide testimony by those present (Officer Huddleston and perhaps Officer Steakley and Mr. Dixon) on Ms. Anderson's exact words and manner of consent falls well short of meeting the Government's burden.

Fourth, this is not a case in which the Government claims that the consent was non-verbal. Even if the Government were to argue that Ms. Anderson consented to a search of the guestroom by showing Officer Huddleston where the Defendant sometimes slept, Ms. Anderson's actions cannot be construed as consent under the particular circumstances of this case. Ms. Anderson testified that after Officer Huddleston asked Mr. Dixon for permission to search and Mr. Dixon responded that he could not grant permission, then Officer Huddleston asked her where the Defendant's bedroom was located. She said that she responded that the Defendant had two bedrooms, one next to her room and that he also slept in the guest bedroom. Ms. Anderson gave this same testimony on direct and cross-examination. Both times, she stated that after her answer, the officers "presumed" and "assume[d]" that they could go to the guestroom and search. [Tr. at 132, 142-43] The Court finds that this testimony does not reveal that Ms. Anderson was giving nonverbal consent because she was responding to a question regarding the location of the bedroom, not to

30

whether Officer Huddleston could search. <u>C.f.</u> <u>United States v. Taylor</u>, No. 96-4169, 1998 WL 109979, at *6 (6th Cir. Mar. 4, 1998) (affirming non-verbal consent when defendant silently got out of his car and opened the trunk in response to the officers suggestion that they look in the trunk for the rental agreement). Officer Huddleson did not testify regarding these details on direct examination, but on cross-examination, he agreed that Ms. Anderson showed him where the guest bedroom was located, after he asked if he could search (see testimony quoted above). The Court does not take Officer Huddleston's terse agreement with the above-quoted questions on cross-examination as affirmative testimony that Ms. Anderson led him to the Defendant's bedroom *in response to* his request to search.

Accordingly, the Court finds that the Government did not carry its burden of showing that Ms. Anderson gave specific and unequivocal consent.


*(ii) No proof of voluntary and intelligent consent*

The Government also failed to carry its burden of proving by clear and positive testimony and by a preponderance of the evidence that Ms. Anderson's alleged consent was given freely, voluntarily, and intelligently. The voluntariness of the consent to search is determined by looking to the totality of the circumstances. <u>Bustamonte</u>, 412 U.S. at 227; <u>United States v. Jones</u>, 846 F.2d 358, 360 (6th Cir. 1988). "Among the relevant circumstances to be scrutinized are the defendant's youth, lack of education or low intelligence, the lack of any warnings regarding the accused's constitutional rights, as well as evidence of duress or coercion, such as, deprivation of food or sleep and prolonged detention or questioning." <u>Jones</u>, 846 F.2d at 360. "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such

knowledge as the *sine qua non* of an effective consent." <u>Bustamonte</u>, 412 U.S. at 227.

Although there is no contention that the police acted coercively in the instant case, the voluntariness of Ms. Anderson's alleged consent was clearly at issue. First, the Court finds that Ms. Anderson was the Defendant's grandmother and appeared to be an older lady. The Court also finds that Ms. Anderson did not understand her constitutional rights. Although the officers had no legal duty to advise Ms. Anderson of her rights, she told them that she did not understand the law, when deferring to Mr. Dixon. Accordingly, the officers were aware that Ms. Anderson was not knowledgeable with regard to legal matters. An individual cannot knowingly give consent to search if he or she is "totally ignorant of the fact that, in the absence of his consent, such invasions of privacy would be constitutionally prohibited." <u>Matlock</u>, 415 U.S. at 188 (Brennan, J., dissenting). Additionally, Officer Henderson testified that Ms. Anderson was confused when she first came to the door that morning. Ms. Anderson also stated that she was confused that morning. Additionally, she testified that she was "upset," "nervous," had nerve problems, had previously had a nervous breakdown, felt the blood rushing to her head, and had not taken her blood pressure medicine that morning. [Tr. at 143] In contrast, Officer Huddleston testified that Ms. Anderson was calm, at least when she was not expressing her concerns about the Defendant, and seemed to understand what was happening, only becoming "very upset" when he told her that he had found the gun.

Looking at the totality of the circumstances–that Ms. Anderson was roused from her bed by commotion outside her house, dressed quickly, opened the door just after her grandson had been taken into custody and placed into a police car, was confused and abrupt with the officers on her porch, could not hear or understand the officers on the porch, repeatedly refused to permit the officers to search, told the officers that she knew nothing about the law, sought to defer the question

32

to Mr. Dixon, was upset and nervous, had a history of nerve problems, was suffering from the effects of not taking her high blood medication that morning, and did not want anyone searching her house [Tr. at 147]–the Court finds that Ms. Anderson's alleged consent was not freely, voluntarily, or intelligently given. Ms. Anderson testified that "[a]fter all that was over with, I found out it was illegal for anyone to come and search your house, unless you give them consent to search the house." [Tr. at 147] Although she initially refused the officers' requests to search, she did not know the law supported her refusal. Accordingly, the Court finds that the evidence seized from 108 Houston Avenue on March 15, 2010, should be suppressed, unless law enforcement would have legally and inevitably discovered this evidence in the March 17, 2010 search pursuant to a search warrant.

## B. Probable Cause for the Issuance of the Search Warrant

Citing to Franks v. Delaware, 438 U.S. 154 (1978), the Defendant argues that the references to items seized in the warrrantless search of 108 Houston Avenue on March 15, 2010, are "false statements" within the search warrant affidavit, that render the issuance of the search warrant invalid. The Government contends that the Defendant has failed to make the required preliminary showing that the search warrant affiant Detective Jock Coleman acted with reckless disregard for the truth in including the information on the March 15 search. Alternatively, it contends that even without the information gleaned in the March 15 search of 108 Houston Avenue, sufficient information existed to provide probable cause to issue the subsequent search warrant for that location. The Court agrees with the Government that the Defendant has failed to make the requisite showing that the affiant Detective Jock Coleman's inclusion of the items seized from the March 15 warrantless search was done with reckless disregard for the truth. On the other hand, the Court finds

33

that the reference to the "consent search" and its results must be elided from the search warrant

affidavit because the March 15 warrantless search was illegal. The Court also finds that the affidavit

still contains probable cause for the search warrant to issue, even without the inclusion of the

information relating to the March 15 search. Finally, despite the fact that the search warrant was

supported by probable cause, the Court finds that it does not meet the particularity requirement of

the Fourth Amendment because it utterly fails to list the items to be seized. Accordingly, the Court

concludes that the search warrant is invalid.


*(1) Probable Cause*

The Fourth Amendment protects the right to be free from unreasonable searches and

seizures. In this respect, a judge shall not issue a warrant for the search of a home or personal

property except upon a finding of "probable cause, supported by oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Probable cause to search is "a fair probability that contraband or evidence of a crime will be found

in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing

"requires only a probability or substantial chance of criminal activity, not an actual showing of such

activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely
> requires that the facts available to the officer would "warrant a man
> of reasonable caution in the belief," Carroll v. United States, 267 U.S.
> 132, 162, . . . (1925), that certain items may be contraband or stolen
> property or useful as evidence of a crime; it does not demand any
> showing that such a belief be correct or more likely true than false.
> A "practical, nontechnical" probability that incriminating evidence is
> involved is all that is required. Brinegar v. United States, 338 U.S.
> 160, 176 . . . (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

The Court begins by observing that the issuing judge's determination that probable cause exists is entitled to "'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. Id. In determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit." United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971). In reviewing the propriety of the search warrant, the Court considers "the evidence that the issuing magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that probable cause existed.'" United States v. Jones, 159 F.3d 969, 973 (6th Cir. 1998) (quoting Gates, 462 U.S. at 238-39) (alterations in original). In addition, "a warrant application must provide sufficient information to allow an issuing judge to independently determine probable cause; his action cannot be a mere ratification of the conclusions of others." United States v. Gunter, No. 07-5277, 2009 WL 37481, at *6 (6th Cir. Jan. 8) (citing Gates, 462 U.S. at 239), cert. denied 130 S. Ct. 194 (2009).

In Franks v. Delaware, the Supreme Court examined whether a defendant ever has the right, pursuant to the Fourth and Fourteenth Amendments, to contest the truthfulness of sworn statements of fact in a search warrant affidavit. 438 U.S. 154, 155, 164 (1978). Sworn affidavits in support of search warrants are, in the first instance, presumed to be valid. Id. at 171.

35

Nevertheless, a defendant may attack the veracity of factual statements in the affidavit under certain limited circumstances:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

Id. at 155-56; see also Bennett, 905 F.2d at 934. If the defendant makes this showing and is granted what has come to be known as a "Franks hearing," he or she must show by a preponderance of the evidence that the affiant intentionally or recklessly included false statements, which are necessary to the probable cause finding, in the affidavit. Franks, 438 U.S. at 156; Bennett, 905 F.2d at 934. If the defendant successfully makes this showing, the evidence gained as a result of the search must be suppressed. Franks, 438 U.S. at 156; Bennett, 905 F.2d at 934.

In the present case, the Defendant has made no preliminary showing, much less a substantial showing, that Detective Coleman included the information from the March 15 warrantless search knowing it was false or with reckless disregard for its falsehood. Nevertheless, the Government offered the testimony of Detective Coleman at the suppression hearing. Detective Coleman stated that Officer Huddleston told him that he had searched 108 Houston Avenue after gaining the consent of the homeowner. Detective Coleman testified that he had no reason to doubt that Officer Huddleston had indeed gotten consent to search. Accordingly, the Court finds that the Franks analysis is not applicable to this case.

On the other hand, based upon the Court's above determination that Officer Huddleston did not have valid consent to search 108 Houston Avenue, the information about items

36

seized during March 15 warrantless search is information from an illegal search. Pursuant to the "independent source rule," "'when a search warrant is based partially on tainted evidence and partially on evidence arising from independent sources, "[i]f the lawfully obtained information amounts to probable cause and would have justified issuance of the warrant apart from the tainted information, the evidence seized pursuant to the warrant is admitted."'" United States v. Shamaeizadeh, 80 F.3d 1131, 1136 (6th Cir. 1996) (quoting United States v. Smith, 730 F.2d 1052, 1056 (6th Cir.1984) (quoting United States v. Williams, 633 F.2d 742, 745 (8th Cir. 1980))). Accordingly, the Court will examine the search warrant affidavit [Exh. 9] without the information gained from the March 15 search to determine whether it still provides probable cause.

Paragraphs 2, 3, and 4, of the search warrant affidavit contain the information relevant to the probable cause analysis. With the illegally gained information removed, they state as follows:

> 2. On or about March 15, 2010 the night clerk of the Oak Ridge Hampton Inn Hotel reported an armed robbery that occurred at approximately 4:52 AM. A lone gunman armed with a black assault rifle and wearing a dark colored "stocking mask" over his face confronted the night clerk at gunpoint and demanded the cash from the cash drawer. The gunman fled the business after stealing the cash from the night clerk. The night clerk recognized the gunman as the same subject who had entered the hotel approximately ten to fifteen minutes earlier inquiring about renting a room. When the subject entered the hotel inquiring about room rentals he was wearing a dark colored Atlanta Braves Baseball cap with the letter "A" on the front, a red hooded pull-over, dark shirt, a red lanyard around his neck and dark colored shoes. The night clerk observed the white four-door vehicle driven by the subject when he entered the hotel and inquired about the room rental. The night clerk observed the same white four-door vehicle drive into the parking lot just before the gunman entered the hotel and robbed the clerk.

> 3. On this date, March 15, 2010, members of the Oak Ridge Police Department developed Darius Lee Anderson, Black male, 6'2, slim build, 19 years of age of 108 Houston Avenue as a possible suspect.

37

Several officer[s] conducted surveillance of Anderson's residence and observed him to exit at approximately 7:45 AM. It should be noted that a white four-door Buick was also observed parked in the driveway of 108 Houston Avenue. Anderson was confronted by officers and detained at the scene for investigation. . . . .[4]

4. On this date, March 15, 2010, I conducted an interview of Darius Lee Anderson at the police department [in] reference [to] the armed robbery of the Oak Ridge Hampton Inn Hotel. Anderson admitted to entering the Hampton Inn on March 15, 2010 and spoke with the night clerk at the front counter about renting a room for he and his girlfriend "Toby." Anderson immediately exited the hotel after receiving the price information, according [to] Anderson. Anderson was wearing an Atlanta Braves Baseball cap a white letter "A" on the front of the cap, a dark colored hooded pullover, and dark colored pants. I reviewed the surveillance video from the Hampton Inn Hotel and observed Darius Lee Anderson entered the lobby area of the hotel and walk to the front counter. Anderson spoke with the night clerk briefly before exiting the hotel. Anderson is observed wearing the aforementioned attire while inside the hotel lobby as reported. Anderson was placed under arrest for aggravated robbery, aggravated assault, and theft under five hundred dollars.

The Court finds that this information is sufficient to provide probable cause to issue a search warrant for 108 Houston Avenue two days after the robbery. The victim of the robbery stated that a man wearing an Atlanta Braves ball cap with the letter "A" on the front and hooded pullover, drove up

---

[4]The information omitted states:

Officers Jeremy Huddleston and Ray Steakley received consent from the home owner, Vernestine Anderson, to search the interior of her residence for evidence of the armed robbery of the Hampton Hotel. During this consent search of the residence the officers located a black assault rifle in the recess area of a headboard inside a bedroom of the residence, a red LG cell phone, a pair of diamond earrings, a red shoe string tied together to make a complete circle, a door key was attached to [t]he shoe string when found, and a black hooded pullover. Vernestine Anderson stated she had never seen the assault rifle before and it does not belong to her. All the other property belongs to her grandson Darius Lee Anderson, according to Vernestine Anderson.

38

to the hotel in a white four-door car, entered the hotel, asked about room rates, and left. The clerk reported that ten to fifteen minutes later, at 4:52 a.m., he saw a white, four-door car in the parking lot and then a gunman entered and committed the robbery. Although the gunman had a stocking mask over his face, the clerk recognized that he was the same man who came in fifteen minutes earlier. Approximately three hours later, law enforcement located the Defendant at 108 Houston Avenue. A white, four-door Buick was parked in the driveway. Later that day, the Defendant gave a statement to Detective Coleman in which he said that he had entered the Hampton Inn on March 15, 2010; spoke to the clerk about renting a room; and then left, after receiving the rate information. The Defendant told Detective Coleman that he was wearing an Atlanta Braves baseball cap with a letter "A" on the front and a hooded pull-over. Detective Coleman viewed the surveillance video from the hotel and identified the Defendant, who spoke with the clerk briefly and was wearing the Atlanta Braves baseball cap and hooded pullover as reported.

Both the Defendant in his statement and the video place the Defendant at the hotel wearing an Atlanta Braves baseball cap and a hooded pullover. The victim of the robbery states that the robber entered fifteen minutes before the robbery, wearing an Atlanta Braves baseball cap and hooded pullover. The clerk stated that he recognized the robber to be the same person who entered earlier. Both times the robber entered, the clerk saw a white, four-door car. The Defendant was located three hours after the robbery at 108 Houston Avenue, and a white, four-door Buick was parked in the driveway. The Court finds that this information provides probable cause to believe that the Defendant committed the robbery.

The Court also finds the affidavit provides probable cause to believe that evidence of the robbery would be found at 108 Houston Avenue. An affidavit offered in support of a search

39

warrant "must indicate a nexus between the place to be searched and the evidence sought and this nexus may be established by the nature of the items and normal inferences of where a person would keep such items." United States v. Hawkins, 278 Fed. App'x. 629, 634 (6th Cir.), cert. denied 129 S. Ct. 588 (2008). "'[A] suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship' necessary to a finding of probable cause." United States v. Savoca, 761 F.2d 292, 297 (6th Cir. 1985) (quoting United States v. Flores, 679 F.2d 173, 175 (9th Cir. 1982), cert. denied, 459 U.S. 1148 (1983)). "[W]hether a sufficient nexus has been shown to a particular location turns in part on the type of crime being investigated, the nature of the things to be seized, the extent of an opportunity to conceal the evidence elsewhere and the normal inferences that may be drawn as to likely hiding places." Id. at 298.

"[A]n issuing judge may infer that a criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." Unied States v. Williams, 544 F.3d 683, 688 (6th Cir. 2008) (affirming the inference of a nexus between the Defendant's home and the firearms he used in furtherance of drug trafficking because he could be expected to keep the instrumentalities of his crimes at his home "[m]uch like a bank robber would keep the proceeds and instrumentalities of his robbery in his home"), cert. denied, 130 S. Ct. 108 (2009). In United States v. Cobb, the Sixth Circuit affirmed the inference of a nexus between a robber's residence and the clothing worn during the robberies and stolen cash:

> [T]he affidavit set forth sufficient facts to permit the issuing judge to infer a link between the evidence sought and [the defendant's] residence. It noted that [the defendant] wore similar or the same clothing and used a similar or the same gun in both bank robberies. The reasonable inference is that this clothing and gun likely would have been in [the defendant's] possession six weeks following the final robbery (when the affidavit was signed) either to hide or

40

potentially use in a future robbery. Also, the affidavit noted that [the defendant] took $100,000 in the Chase robbery, that he purchased a Jeep for $7000 the next day, and that, on May 21, 2007, he had a "huge amount of $100 bills on him." . . . . Again, the reasonable inference is that [the defendant] had a significant portion of the remaining funds in his control when the affidavit was signed on May 31, 2007.

397 F. App'x 128, 133 (6th Cir. 2010) (observing that the affidavit also stated that the affiant knew that serial robbers kept clothing worn during the robberies and the proceeds therefrom in readily accessible locations, like houses), cert. denied, 131 S. Ct. 1801 (2011). The Sixth Circuit has also affirmed a search of a residence for the proceeds of a bank robbery, when the defendant was arrested at a car wash and dye-stained money from a bank robbery committed earlier that day was found in his car: "Given the evidence tending to connect the defendant to the bank robbery, including the discovery of some but not all of the money taken from the bank, it was reasonable to assume that the remainder might be found at the defendant's residence, thereby creating a nexus sufficient to establish probable cause for the issuance of the warrant." United States v. Jackson, 240 F. App'x 88, 90 (6th Cir. 2007).

In the present case, the affidavit identifies 108 Houston Avenue as the Defendant's residence[5] and states that he was taken into custody there approximately three hours after the robbery of the Hampton Inn. The issuing judge had no evidence before him that the Defendant was ever

---

[5]Although the undersigned heard testimony at the suppression hearing that the Defendant was, at most, a part-time resident of 108 Houston Avenue, the Court evaluates probable cause by looking only to what the issuing judge knew. The search warrant affidavit states with regard to 108 Houston that "[t]his residence is that of Vernestine Anderson and is shared with her grandson Darius Lee Anderson." Moreover, paragraph 2 states that the officers conducted surveillance of the Defendant's residence and saw him exit at 7:45 a.m. Accordingly, based upon the evidence before him, the issuing judge believed 108 Houston was the Defendant's residence.

41

released from custody.[6]  The Court finds that the issuing judge could reasonably infer that the Defendant, the perpetrator of an armed robbery, would keep the instrumentalities and fruits of his crime, i.e., the clothes he wore before and during the robbery and the currency he took, in his residence to hide them.  Moreover, the short period of time between the robbery and the officers' taking the Defendant into custody at 108 Houston Avenue would leave little opportunity for the robber to conceal the evidence elsewhere.  Although the affidavit accused the Defendant of only one robbery, unlike the defendant in Cobb, the Court finds that the inference is still valid due to the short period of time between the robbery and the seizure of the Defendant, similar to Jackson, yet in this case, the Defendant was actually seized at the residence, creating a stronger nexus.

Finally, the Court finds that the issuing judge had probable cause to believe that the clothing worn by the Defendant both before and during the robbery of the Hampton Inn and the cash taken during the robbery would still be at 108 Houston Avenue on March 17, 2010, two days after the robbery.  Whether information in an affidavit supporting a search warrant is stale depends upon the nature of the crime, whether the perpetrator is "nomadic or entrenched," whether the item to be seized is of an enduring value to the perpetrator, and whether the place to be searched is one of mere convenience to the perpetrator or is a "secure operational base."  United States v. Spikes, 158 F.3d

---

[6]While not mentioned by the parties, the Court notes that the "CONCLUSION" of the search warrant affidavit states that the affiant believes that "Darius Lee Anderson is in possession and or control of stolen property that was stolen from the Hampton Inn Hotel and clothing was wore [sic.] during the robbery of the Hampton that occurred on the 15th of March 2010."  The final sentence of the conclusion asks that the search warrant issue "for Darius Lee Anderson for the seizure of said evidence, or any part thereof, and that the same be brought before the Criminal Court of Anderson County, Tennessee, as provided by law."  The Defendant's continued possession of the evidence and a request to search for the Defendant would contradict an inference that the Defendant remained in custody following his March 15 arrest.  On the other hand, this information is the affiant's conclusion and is not borne out by the facts offered to support the issuance of the search warrant in the body of the affidavit.

913, 923 (6th Cir. 1998). The instant affidavit states that the Defendant was taken into custody immediately after he exited 108 Houston Avenue on March 15, 2010. On that same day, Detective Coleman interviewed the Defendant at the police department and then subsequently arrested him for aggravated robbery, aggravated assault, and theft. The issuing judge could reasonably infer that the Defendant remained in police custody at the time the search warrant was sought. Accordingly, it was also reasonable for the issuing judge to believe that any evidence that the Defendant concealed at the residence would still be there on March 17, 2010. See, e.g. Cobb, 397 F. App'x at 133 (affirming the inference that clothing worn during bank robberies and proceeds therefrom would still be at the residence six weeks after the last robbery and ten days after the defendant was seen in possession of a large number of one-hundred dollar bills).

Accordingly, the Court finds that probable cause existed for the issuance of the search warrant for 108 Houston Avenue even without the information obtained in the illegal warrantless search on March 15, 2010. However, despite this finding with regard to probable cause, the search warrant still fails to meet the particularity requirement of the Fourth Amendment, as set forth below.

*(2) Particularity*

The Fourth Amendment requires that "[n]o warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. am. IV. The particularity requirement forecloses the opportunity for a general search and "prevents the seizure of one thing under a warrant describing another" by restricting the discretion of the executing officer. Marron v. U.S., 275 U.S. 192, 196 (1927). "'A general order to explore and rummage through a person's belongings is not permitted.

43

The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized.'" United States v. Savoy, 280 F. App'x 504, 510 (6th Cir.) (quoting United States v. Cook, 657 F.2d 730, 733 (5th Cir. 1981)), cert. denied, 129 S. Ct. 742 (2008). "The particularity requirement eliminates the 'danger of unlimited discretion in the executing officer's determination of what is subject to seizure.'" Id. (quoting United States v. Savoca, 761 F.2d 292, 298-99 (6th Cir. 1985)). "[T]he degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." United States v. Henson, 848 F.2d 1374, 1383 (6th Cir. 1988). The description of items to be seized pursuant to a search warrant is sufficient "'if it is as specific as the circumstances and the nature of the activity under investigation permit.'" Id. (quoting United States v. Blum, 753 F.2d 999, 1001 (11th Cir. 1985)).

In the present case, the search warrant [Exh. 9] states that based upon the affidavit of Detective Coleman, probable cause exists to believe that "Vernestine Anderson, of 108 Houston Avenue Oak Ridge, Tennessee is now in possession and control of certain evidence pertaining to an Aggravated Robbery case that occurred in Oak Ridge, Tennessee on the 15th of March 2010." The search warrant continues by stating that "[s]aid evidence is now located on and within the residence of 108 Houston Avenue, Oak Ridge, Tennessee:". Then, instead of providing a list of the items to be seized, the search warrant simply repeats the description of the crime by quoting verbatim paragraph 2 of the search warrant affidavit, which appears to have been cut and pasted into the body of the search warrant:

> On or about March 15, 2010 the night clerk of the Oak Ridge Hampton Inn Hotel reported an armed robbery that occurred at approximately 4:52 AM. A lone gunman armed with a black assault rifle and wearing a dark colored "stocking mask" over his face confronted the night clerk at gunpoint and demanded the cash from

44

the cash drawer. The gunman fled the business after stealing the cash from the night clerk. The night clerk recognized the gunman as the same subject who had entered the hotel approximately ten to fifteen minutes earlier inquiring about renting a room. When the subject entered the hotel inquiring about room rentals he was wearing a dark colored Atlanta Braves Baseball cap with the letter "A" on the front, a red hooded pullover,[7] dark shirt, a red lanyard around his neck and dark colored shoes. The night clerk observed the white four-door vehicle driven by the subject when he entered the hotel and inquired about the room rental. The night clerk observed the same white four-door vehicle drive into the parking lot just before the gunman entered the hotel and robbed the clerk.

The Court finds that this paragraph is clearly not a list of items to be seized and, as such, fails to satisfy the particularity requirement. The Court finds this search warrant to be like that analyzed by the Supreme Court in Groh v. Ramirez, 540 U.S. 551 (2004). In Groh, the search warrant gave a description of the house to be searched in the place provided for the description of the things to be seized. Id. at 554-55. The Supreme Court found the search warrant to be "plainly invalid" due to its utter failure to particularize the items to be seized. Id. at 557. Moreover, the Supreme Court found the "fact that the *application* adequately described the 'things to be seized' [did] not save the *warrant* from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." Id.

The Court notes that the search warrant affidavit in this case specifically lists the evidence pertaining to the aggravated robbery. "Evidence pertaining to said crimes is more particularly described as follows:"

One men's red hooded pullover, one men's black or dark blue hooded pullover with large unknown print on back, an Atlanta Braves Baseball cap dark in color with the letter "A" on the front, a dark in

---

[7]The word "pullover" is hyphenated (i.e., "pull-over") in the search warrant affidavit, but this is the only difference between the affidavit and the search warrant.

color "stocking mask", and U. S. Currency taken during the armed
robbery, which occurred at the Oak Ridge Hampton Inn Hotel located
at 208 South Illinois Avenue, Oak Ridge Tennessee on the 15th of
March 2010.

The Court suspects that this is the paragraph that was intended to be copied into search warrant.

Nevertheless, the instant search warrant affidavit (like the affidavit in Groh) was not incorporated

into the search warrant, and there is no evidence that it accompanied the search warrant when it was

executed. "[U]nless the particular items described in the affidavit are also set forth in the warrant

itself (or at least incorporated by reference, and the affidavit present at the search), there can be no

written assurance that the Magistrate actually found probable cause to search for, and to seize, every

item mentioned in the affidavit." Id. at 560.

Finally, the Court anticipates an objection that the executing officers could

conceivably sift out the items to be seized from the narrative paragraph lifted from the affidavit and

inserted into the search warrant. The Court finds that the paragraph describing the robbery of the

Hampton Inn[8] cannot be construed to be a list of the items to be seized for two main reasons. First,

---

[8] In her dissenting opinion in United States v. Brown, Judge Batchelder describes the
particularity requirement as having "two aspects:"

First, the warrant must provide a particular description of the places to be
searched and the things to be seized. Marron v. United States, 275 U.S. 192,
195-96 . . . (1927). Second, the warrant should provide a sufficiently detailed
explanation of the suspected criminal activity that occasions the search to enable
the executing officers to limit their search to evidence relating to that criminal
activity and to inform the subjected individual what property the officers are
entitled to take. Rickert v. Sweeney, 813 F.2d 907, 909 (8th Cir. 1987).

49 F.3d 1162, 1173-74 (6th Cir. 1995) (Batchelder, J., dissenting). "Inadequacy of the warrant in
one of these respects may be compensated for by specificity and completeness in the other, but to
be valid, the warrant must contain the information necessary to properly limit the search and
seizure. . . . . Therefore, a warrant is facially invalid if it neither particularly describes the places
to be searched and the things to be seized nor adequately describes the suspected criminal

it does not serve the primary purpose of the Fourth Amendment's requirement of particularity because it does not limit the executing officers' discretion over what to seize. For example, the paragraph states that U. S. Currency was taken by the robber but it does not say how much, in what denominations, or provide any other details that would limit the officers' discretion. Thus, the officers could seize any and all cash that they could find in any part of 108 Houston Avenue, such as in Vernestine Anderson's purse. Second, this paragraph cannot be construed to be the list of items to be seized because probable cause does not exist to seize some of the items in the paragraph. For example, at the time the search warrant was executed, the issuing judge knew that the black assault rifle and the red lanyard had already been seized during the March 15, 2010 warrantless search. Thus, probable cause did not exist to believe that the black assault rifle and the red lanyard would still be at 108 Houston Avenue.

Accordingly, the Court finds that the search warrant is invalid. Although "the remedy for an overly broad warrant is to sever the overly broad portions of the warrant from those portions that are sufficiently particular[,]" United States v. Ford, 184 F.3d 566, 578 (6th Cir. 1999), a search warrant that utterly fails to particularize the items to be seized is invalid. Groh, 540 U.S. at 558-59. In Groh, the Supreme Court held that the failure to describe the items to be seized at all rendered the search warrantless:

> This warrant did not simply omit a few items from a list of many to be seized, or misdescribe a few of several items. Nor did it make what fairly could be characterized as a mere technical mistake or typographical error. Rather, in the space set aside for a description of

conduct to which the search is related." Id. at 1174. Although the instant search warrant is quite particular with regard to its description of the crime that occasions the search, the Court finds, as discussed in the body of this opinion, that the search warrant's complete silence as to the items to be seized prevents it from limiting police discretion as required by the Fourth Amendment.

47

> the items to be seized, the warrant stated that the items consisted of
> a "single dwelling residence ... blue in color." In other words, the
> warrant did not describe the items to be seized *at all*. In this respect
> the warrant was so obviously deficient that we must regard the search
> as "warrantless" within the meaning of our case law.

Id. at 558. "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to

conform to the particularity requirement of the Fourth Amendment is unconstitutional."

Massachusetts v. Sheppard, 468 U.S. 981, 988 n.5 (1984); Groh, 540 U.S. at 560. Because the

March 17, 2010 search of 108 Houston Avenue was pursuant to an invalid search warrant, the Court

recommends that all of the evidence seized during that search–two hooded jackets and two Atlanta

Braves baseball caps–be suppressed.


### C. Application of the Exclusionary Rule

Relying on the Supreme Court's decisions in Herring v. United States, 129 S. Ct. 695

(2009), the Government argues that even if the Court finds that the officers did not have valid

consent to search the residence, the exclusionary rule should not be applied to the evidence gleaned

as a result of the March 15, 2010 warrantless search because the officers were acting in good-faith

reliance on the consent of Vernestine Anderson. Likewise, it asserts that the officers acted in good-

faith reliance on the search warrant in seizing items from 108 Houston on March 17, 2010. Thus,

the Government contends that suppression of the evidence from the March 15 warrantless search and

the March 17 search pursuant to a search warrant would not yield a deterrent effect in this case.

Alternatively, the Government argues that the evidence seized in the March 15, 2010 warrantless

search of 108 Houston would have been inevitably discovered two days later in the March 17 search

of the residence pursuant to the search warrant. The Court considers, first, whether the exclusionary

rule applies in this case to the evidence seized in either search, and, second, if the exclusionary rule applies, whether the inevitable discovery exception serves to preserve the admissibility of the evidence.

*(1) March 15, 2010 Warrantless Search*

"The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible." United States v. Dice, 200 F.3d 978, 983 (6th Cir. 2000); Mapp v. Ohio, 367 U.S. 643, 654 (1961) (holding that "all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court"); Weeks v. United States, 232 U.S. 383, 398-99 (1914) (establishing the exclusionary rule as the remedy for violations of the Fourth Amendment). However, the exclusionary rule is not applied automatically upon a finding of a Fourth Amendment violation. See Herring, 129 S. Ct. at 700. Exclusion of evidence is "a judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Id. at 699 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only where "its remedial objectives are thought most efficaciously served," Arizona v. Evans, 514 U.S. 1, 11 (1995), and where it "'results in appreciable deterrence.'" Herring, 129 S. Ct. at 700 (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). "'[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'" Herring, 129 S. Ct. at 700 (quoting Illinois v. Krull, 480 U.S. 352-53 (1987)). In the end, the decision to suppress evidence "turns on the culpability of the police and the potential for exclusion to deter wrongful police conduct." Id. at 698.

In Herring, the Court declined to apply the exclusionary rule to a Fourth Amendment violation stemming from the negligence of police personnel in failing to remove a withdrawn arrest

warrant from the computer, finding that an "error that arises from nonrecurring and attenuated negligence is thus far removed from the core concerns that led us to adopt the [exclusionary] rule in the first place." Id. at 702. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. In other words, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Id.

In the present case, the Government contends that the officers conducted the warrantless search of 108 Houston in good-faith reliance on Ms. Anderson's consent. The Court has found that while Officer Huddleston may have believed that Ms. Anderson agreed to the search of her home based upon her pointing out the location of the guestroom and his inexperience, Ms. Anderson did not, in fact, give consent. Instead, Ms. Anderson expressly refused consent first to Officer Henderson and Lieutenant Jenkins and then again to Officer Huddleston. Officer Huddleston's belief that he had gained consent to search in the face of Ms. Anderson's express refusals, admissions that she was not knowledgeable on the law, and confused and emotional state were, at the very least, misguided and, at worst, based upon an incorrect understanding of what constitutes consent. He did not attempt to secure Ms. Anderson's written consent, nor did he use any other means to record or substantiate what he believed to be her consent. Unlike the officers in Herring who relied upon the representation of other law enforcement personnel that an arrest warrant was outstanding or the officers executing the search warrant in United States v. Leon, 468 U.S. 897 (1984), who relied upon the judge's determination that probable cause to issue a search warrant existed, Officer Huddleston made the decision to search 108 Houston Avenue. The Court finds that

50

Officer Huddleston's search of the residence without first gaining specific, unequivocal, and knowing consent is precisely the kind of conduct the exclusionary rule was intended to deter. The Court concludes that the circumstances carved out by Herring do not apply in this case and the exclusionary rule should be applied to the evidence seized in the warrantless search on March 15, unless the inevitable discovery exception to the exclusionary rule applies.

*(2) March 17, 2010 Search Pursuant to a Search Warrant*

Although the Government did not address the facial invalidity of the March 17 search warrant, it does argue that the evidence from the March 17 search of the residence should not be excluded because the executing officers acted in good-faith reliance on the search warrant. In United States v. Leon, the Supreme Court recognized that the deterrent effect of the judicially created exclusionary rule did not extend to situations in which an officer in objective good faith obtains a search warrant from a judge and acts within the scope of that warrant. 468 U.S. 897, 920 (1984). "In the ordinary case, an officer cannot be expected to question the [judge's] probable-cause determination or his judgment that the form of a warrant is technically sufficient. . . . . Penalizing the officer for the [judge's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." Id. at 921.

The fact that a judge has issued a warrant typically will establish that the officer has conducted the search pursuant to said warrant in good faith, but the officer's reliance upon the warrant must be objectively reasonable. Id. at 922. In other words, the good-faith inquiry turns upon "whether a reasonably well-trained officer would have known that the search was illegal despite the [judge's] authorization." Id. at 922 n.23. In creating this standard, the Supreme Court set out four

situations in which suppression pursuant to the exclusionary rule applies despite the officer's reliance upon a judicially-issued search warrant:  (1) "if the . . . judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," (2) if the issuing judge "wholly abandoned his judicial role" requiring neutral detachment and, in essence, acted as "'an adjunct law enforcement officer,'" (3) if the "warrant [was] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and (4) if "the warrant [is] so facially deficient–i.e., in failing to particularize the place to be searched or the things to be seized–that the executing officers cannot reasonably presume it to be valid."  Id. at 923 (quoting Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 326-27 (1979) and Brown v. Illinois, 422 U.S. 590, 610-11 (1975) respectively).

In the present case, the Court finds that the search warrant for 108 Houston Avenue was so facially deficient in failing to provide any particularization of the items to be seized that it was unreasonable for Detective Coleman and the executing officers to presume it was valid.  In Groh v. Ramirez, the Court found that it was unreasonable for the officer to presume the warrant was valid in the absence of any list of items to be seized.  540 U.S. 551, 565 (2004) (analyzing whether the officer had qualified immunity for the search and recognizing that qualified immunity involves the "same standard of objective reasonableness" as the Leon good-faith analysis).  Like the search in Groh, the Court finds that the March 17 search is not saved by the good-faith exception.  Accordingly, the Court recommends that the exclusionary rule be applied to the evidence seized in the March 17 search, unless the inevitable discovery exception to the exclusionary rule applies.

*(3) Inevitable Discovery Exception*

The inevitable discovery doctrine excepts from exclusion those items that were unlawfully obtained if they would have been inevitably discovered. See Nix v. Williams, 467 U.S. 431, 444-46 (1984). In such cases, "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." Id. at 444. The inevitable discovery doctrine applies only "when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." United States v. Kennedy, 61 F.3d 494, 499 (6th Cir. 1995). The government must make this demonstration by a preponderance of the evidence, and the following guidelines apply:

> For the inevitable discovery exception to apply, it must be demonstrated that the evidence inevitably would have been acquired through lawful means had the government misconduct not occurred. [Nix,] at 444, . . ., see Murray v. United States, 487 U.S. 533, 539 . . . (1988). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." Nix, 467 U.S. at 444 n.5 . . . . "The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992), cert. denied, 510 U.S. 1045 . . . (1994).

Kennedy, 61 F.3d at 497-98, see, e.g., United States v. Taylor, 248 F.3d 506, 514 (6th Cir. 2001).

The Government contends that "[i]t is reasonable to conclude that, upon executing the [March 17] search warrant, the exact same items that were discovered by two ORPD officers during the [March 15] consent search would have been found by the officers executing the search warrant." [Doc. 35, p.9] It is well-settled that the inevitable discovery doctrine does not apply

merely because at the time of the illegal search, law enforcement had probable cause and could have obtained a search warrant. United States v. Johnson, 22 F.3d 674, 683 (6th Cir. 1994). Such a premise would circumvent the Fourth Amendment's insistence on a search warrant. Id.; United States v. Quinney, 583 F.3d 891, 894-95 (6th Cir. 2009) (collecting cases). On the other hand, if the officers actually seek and obtain a valid search warrant based upon evidence other than that gained during the illegal search, then the inevitable discovery doctrine applies. Murray v. U.S., 487 U.S. 533, 540-42 (1988) (applying the independent source and inevitable discovery doctrines to affirm the seizure of bales of marijuana observed during an illegal entry but not seized until a search warrant was obtained); United States v. Bowden, 240 F. App'x 56, 63 (6th Cir. 2007), cert. denied 552 U.S. 1221 (2008).

"[T]he inevitable discovery exception to the exclusionary rule applies when, . . ., evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first." United States v. Keszthelyi, 308 F.3d 557, 574 (6th Cir. 2002). In such a case, the second search pursuant to a valid search warrant constitutes "compelling facts" for finding that the evidence in question would have been inevitably discovered. Bowden, 240 F. App'x at 63; Keszthelyi, 308 F.3d at574. Finally, the Court observes that while probable cause for the search warrant supporting the second search cannot depend upon "tainted" evidence gained in the initial illegal search, the second search may still provide a basis for application of the inevitable discovery doctrine, if probable cause exists after the tainted evidence is excluded. Bowden, 240 F. App'x at 62; Keszthelyi, 308 F.3d at 575.

In the present case, if the March 17 search warrant had been valid, it could have provided a basis for the application of the inevitable discovery doctrine. As discussed above,

probable cause existed for the issuance of the search warrant even excluding the evidence seized in the March 15 warrantless search. Arguably, probable cause would exist to support the March 17 search warrant even excluding the Defendant's March 15 statement admitting that he had gone to the Hampton Inn and had worn certain clothing.[9] Nevertheless, the Court does not need to examine the probable cause question further because, for the inevitable discovery doctrine to apply, the second search must be pursuant to a *valid search warrant*. See Bowden, 240 F. App'x at 63. This Court has already found that the March 17 search warrant in this case failed to meet the particularity requirement. To assume that the March 17 search warrant would have contained a particularized list of items to be seized if the illegal, warrantless search had never occurred would be engaging in the very type of speculation prohibited by the case law. Nix, 467 U.S. at 444 n.5 (observing that "inevitable discovery [analysis] involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment"); Kennedy, 61 F.3d at 498 (quoting Nix). Instead, the Court must look to the historical facts to determine what would have happened, and in this case, the fact is that the March 17 search warrant was facially invalid. Accordingly, the Court cannot find that the officers would have inevitably discovered the evidence seized on March 15, 2010, when executing the March 17 search warrant because that search warrant was invalid.

In summary, the inevitable discovery doctrine does not apply in this case because the second search of the residence was not pursuant to a valid search warrant. The Court finds that the

---

[9]In determining whether illegally gained evidence would have inevitably been discovered in a second, legal search pursuant to a search warrant, the Court must view the evidence as it existed just before the illegal search. Kennedy, 61 F.3d at 498; United States v. Alexander, 540 F.3d 494, 502 (6th Cir. 2008). In so viewing the evidence in the instant case, the Court arguably cannot assume that the Defendant would have given a statement on March 15, 2010, absent the officers conducting the warrantless search of 108 Houston Avenue and finding the gun and the other evidence.

55

exclusionary rule should be applied to exclude the evidence seized in both the March 15 and March 17, 2010 searches of 108 Houston Avenue.

## V.  CONCLUSION

After carefully considering the motion, memoranda, testimony, exhibits, and oral arguments and after reviewing the relevant legal authorities, the Court finds that the warrantless search of 108 Houston Avenue on March 15, 2010, violated the Fourth Amendment because the officers did not have valid consent.  The Court also finds that the March 17, 2010 search of 108 Houston Avenue was invalid because it was based upon a facially deficient search warrant.  Finally, the Court finds that the exclusionary rule should be applied to suppress the evidence gained in the illegal searches on March 15 and 17, 2010, and that the evidence would not have been inevitably discovered.  For the reasons set forth herein, it is **RECOMMENDED** that the Defendants' Motion to Suppress Evidence  [**Doc. 33**] be **GRANTED**.[10]

Respectfully submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[10]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

56